UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR ENVIRONMENTAL HEALTH, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GINA MCCARTHY, et al., <br><br> Defendants. | Case No. 15-cv-02939-WHO <br><br> **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. Nos. 30, 32 |

## INTRODUCTION

The Federal Insecticide, Fungicide, and Rodenticide Act, under which the Environmental Protection Agency can regulate pesticides, requires that active ingredients be disclosed on pesticide labels. Inert ingredients are not subject to the same requirements. For a decade plaintiffs Center for Environmental Health, Beyond Pesticides and Physicians for Social Responsibility have urged defendants Environmental Protection Agency and its Administrator[1], (collectively "EPA"), to require the disclosure of 371 inert ingredients on the labels of pesticide products. They previously filed an initial rulemaking petition and two related lawsuits and now challenge the EPA's May 2014 decision that effectively denied their petition. Both sides have moved for summary judgment.

The plaintiffs are understandably frustrated that the rulemaking process they initiated almost ten years ago has generated no concrete action. They may well be on the right side of the policy argument. But the EPA is not mandated to require disclosure of the inert ingredients at issue. Its decision to pursue non-rulemaking alternatives to address the issue is not arbitrary or capricious. As a result, I must GRANT the EPA's motion for summary judgment and DENY

---
[1] Now Gina McCarthy.

plaintiffs' motion for summary judgment.

**BACKGROUND**

In August 2006, a coalition of numerous states and public health organizations, including plaintiffs, petitioned the EPA to initiate rulemaking to require the labeling of 371 inert ingredients on pesticides. Three years later plaintiffs filed a lawsuit against the EPA because it had not acted on the petition. *Ctr. for Envt'l Health Californians for Pesticide Reform v. United States Environmental Protection Agency, et al.,* No. 09-cv-02868-PJH (N.D. Cal. June 26, 2009), Dkt. No. 1. They alleged that the EPA's unreasonable delay in acting on the petition violated the Administrative Procedure Act. The EPA issued a response in September 2009, stating that it would be "initiating rulemaking to increase the public availability of hazardous inert ingredient identities for specific pesticide formulations" but that it was "not committing [] to any particular outcome for rulemaking." AR 2788.[2] Plaintiffs then voluntarily dismissed their claims.

The EPA initiated its rulemaking via an Advance Notice of Proposed Rulemaking ("ANPR") published in the Federal Register on December 23, 2009. 74 Fed. Reg. 68, 215. The EPA solicited comments on two alternative proposals – one that would have required listing only "potentially hazardous" inert ingredients and another that would have required listing most or all inert ingredients, regardless of hazard. 74 Fed. Reg. 68, 219-22. In response, the EPA received 405 comments from the public. However, no rule was issued as a result.

In March 2014, plaintiffs filed a second lawsuit asserting that the EPA had not taken further action to follow through on its commitment to adopt a rule since it had published the ANPR in December 2009. *Ctr. for Envt'l Health v. McCarthy*, No. 14-cv-01013-WHO (N.D. Cal. March 5, 2014), Dkt. No. 1. Plaintiffs once again alleged that the EPA's delay in completing the rulemaking process or otherwise concluding the action violated the Administrative Procedure Act. A little over two months later, on May 22, 2014, the EPA amended its 2009 response to plaintiffs' 2006 petition. The EPA's amended response explained that "the EPA has now decided not to pursue finalization of the rulemaking it initiated seeking to mandate the disclosure on the label of a

---

[2] All "AR" cites are to the administrative record in this case.

pesticide of the presence of a hazardous inert ingredient." AR2875. Instead it stated that it had "re-evaluated" how to best address potentially hazardous inert ingredients and believed a different approach was more appropriate. AR2877. In the letter, the EPA asserted it would "review inert ingredients currently listed for use in pesticides, update that list, establish criteria for prioritization, and select top candidate inert ingredients for further analysis and potential action." *Id*.

The EPA thereafter moved for judgment on the pleadings in the 2014 lawsuit. Because the EPA had acted on plaintiffs' underlying petitions, I granted the motion, finding that there was no further relief that I could offer to the plaintiffs and that the action was moot. *Ctr. for Envt'l Health v. McCarthy*, No. 14-cv-01013-WHO, (N.D. Cal. Sept. 15, 2014), Dkt. No. 31.

Plaintiffs' instant lawsuit challenges the EPA's May 2014 denial of their rulemaking petition. Their complaint alleges a sole cause of action under the Federal Insecticide, Fungicide, and Rodenticide Act and the Administrative Procedure Act. Plaintiffs seek, among other relief, to set aside the denial and to remand the decision to the EPA to consider "the evidence weighing in favor of disclosure of inert pesticides ingredients." Compl. at 14 [Dkt. No. 1]. They move for summary judgment, arguing that the EPA's decision to deny plaintiffs' rulemaking petition was arbitrary, capricious, and contrary to the Federal Insecticide, Fungicide, and Rodenticide Act. The EPA oppose and cross-move for summary judgment, asserting that its decision was reasonable and should be upheld. I held a hearing on June 8, 2016.

## LEGAL STANDARD

When a district court reviews an administrative agency's decision, pursuant to the Administrative Procedures Act, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir.1985). The court does not resolve any issues of disputed facts. *Id*. at 769. Instead, the court must uphold an agency decision unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2). This is a "deferential standard... designed to ensure that the agency considered all of the relevant factors and that its decision contained no clear error of judgment." *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l*

*Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001). An agency action should be overturned only when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*.

## DISCUSSION

### I. DISCLOSURE REQUIREMENTS

Plaintiffs assert that the 371 inert ingredients identified in their petition have been designated by the EPA or the Occupation Safety and Health Administration ("OSHA") as hazardous under one or more federal statutes, including the Clean Air Act, 42 U.S.C. § 7401, the Clean Water Act, 33 U.S.C. § 1251, and the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001. As a result of these designations, plaintiffs insist that certain subsections of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") and related regulations mandate that the EPA require disclosure of these chemicals on pesticide products.

Under FIFRA, the EPA is required to "determin[e] the risks which may be posed by a pesticide and impos[e] the necessary regulatory requirement to adequately control an unreasonable risk." 40 Fed. Reg. 28,252. Generally, before allowing the registration of a pesticide, the EPA must determine, among other things, that the pesticide "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(d). The statute defines "unreasonable adverse effects" to mean: (1) "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide," or (2) "a human dietary risk from residues that result from a use of a pesticide in or on any food" inconsistent with the standard under section 408 of the Federal Food, Drug, and Cosmetic Act. 7 U.S.C. § 136(bb). Depending on the risk involved, the agency is authorized to deny a product's registration, classify the pesticide for restricted use, or require specific label statements. 40 Fed. Reg. 28,252. While the regulations provide that the EPA may require the listing of inert ingredients on a product's label, this power "does not affect [the EPA's] authority to take other regulatory action if the label statement does not protect against the hazard." *Id*. Section

1    10(d)(1)(C) of FIFRA provides that FIFRA "does not authorize the disclosure of any information
2    that . . . discloses the identity or percentage quantity of any deliberately added inert ingredient of
3    a pesticide" unless the EPA has first "determined that disclosure is necessary to protect against an
4    unreasonable risk of injury to health or the environment." 7 U.S.C. § 136h(d)(1)(C) ("This
5    paragraph does not authorize the disclosure of any information that: . . . (c) discloses the identity
6    or percentage quantity of any deliberately added inert ingredient of a pesticide, unless the
7    Administrator has first determined that disclosure is necessary to protect against an unreasonable
8    risk of injury to health or the environment.").

The parties disagree over whether the hazard designations that plaintiffs identify constitute the basis for a finding of "unreasonable risk" under FIFRA. Plaintiffs assert, for example, that the EPA's decisions to label seventy-nine of the ingredients at issue as hazardous for the purposes of the Clean Water Act are the functional equivalent of an "unreasonable risk" determination under FIFRA. The EPA responds that an unreasonable risk finding under FIFRA is distinct from any previous determination. But assuming that plaintiffs are correct, the EPA still is not obligated to address the risk through mandatory label disclosure. Contrary to plaintiffs' arguments, section 10(d)(1)(C) does not *require* EPA to disclose any inert ingredients, but simply *authorizes* it to do so after the agency has made the requisite preliminary determination. *See* 7 U.S.C. § 136h(d)(1)(C).

In support of its position that the EPA must act once it makes a hazard determination, plaintiffs rely heavily on *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007). In *Massachusetts*, the Supreme Court reviewed the EPA's denial of a rulemaking petition requesting that the agency regulate greenhouse gas emissions from motor vehicles under the Clean Air Act. 549 U.S. at 510. The EPA had denied the petition on two grounds: (1) the Clean Air Act did not authorize it to issue regulations concerning climate change, and (2) even if it did, it would have been "unwise" to do so because of various policy considerations. *Id*. at 511.

The Clean Air Act provides that the EPA "*shall* by regulation prescribe . . . standards applicable to the emission of any new air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [the EPA's] judgment cause, or contribute to, air pollution

which may reasonably be anticipated to endanger public health or welfare." *Id*. at 506 (emphasis added). Based in part on this language, the Court concluded that the EPA had the requisite statutory authority to regulate greenhouse gasses under the Clean Air Act and that the EPA had offered "no reasoned explanation for its refusal to decide whether greenhouse gases cause or contribute to climate change." *Id*. at 534.

Plaintiffs argue that because the Court in *Massachusetts* used the term "authorize" to describe the EPA's power under the Clean Air Act, I should also find that EPA has a requirement to act in this case. But *Massachusetts* does not stand for the proposition that because the EPA is authorized to act in accordance with the requested rulemaking, it is obligated to do so. In *Massachusetts*, the EPA argued that it lacked authority under section 202(a)(1) of the Clean Air Act to regulate new vehicle emissions because carbon dioxide is not an "air pollutant" as defined by the Act. *Id*. at 528. The Court determined that because "greenhouse gases fit well within the Clean Air Act's capacious definition of 'air pollutant,' we hold that the EPA has the statutory authority to regulate the emission of such gases." *Id*. at 532. But the Court did not stop there. It went on to hold that, pursuant to the statutory language, if the "EPA makes a finding of endangerment, the Clean Air *requires* the Agency to regulate emission of the deleterious pollutant from new motor vehicles." *Id*. (quoting a section of the statute stating that the EPA "*shall* by regulation prescribe…standards applicable to the emission of any air pollutant") (emphasis added).

Here, section 10(d)(1)(C) of FIFRA does not use the word "shall" or any similar mandatory language. The statute's use of the term "authorize" does not convert it to the "clear statutory command" at issue in *Massachusetts*. *Id*. at 533. As a result, plaintiffs' argument that this section of FIFRA mandates that the EPA disclose the 371 inert ingredients is unconvincing.

Similarly, plaintiffs' characterization of 40 C.F.R. § 156.10(g)(7) as establishing the criteria which, if met, require disclosure, is inaccurate. This regulation provides that "[t]he Administrator *may* require the name of any inert ingredient(s) to be listed in the ingredient statement if he determines that such ingredient(s) may pose a hazard to man or the environment." 40 C.F.R. § 156.10(g)(7) (emphasis added). While this permits EPA to require the listing of hazardous inert ingredients, it does not mandate it.

Plaintiffs' also argue that the EPA has discarded its previous factual findings without a reasoned explanation in violation of the Ninth Circuit's ruling in *Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956 (9th Cir. 2015). At issue in *Kake* was a 2001 decision by the United States Department of Agriculture to promulgate a "roadless rule," limiting road construction and timber harvesting in national forests, and to apply it to the Tongass National Forest. 795 F.3d at 959. Two years after it made this decision, the Department of Agriculture, relying on the identical factual record compiled in 2001, reversed its course, finding that the application of the roadless rule to the Tongass National Forest was unnecessary. *Id*. In deciding whether this change was justified, the Ninth Circuit explained that a policy change complies with the Administrative Procedure Act if the agency: (1) "displays awareness that it is changing position," (2) "shows that the new policy is permissible under the statute," (3) "believes the new policy is better," and (4) "provides good reasons for the new policy, which, if the new policy rests upon factual findings that contradict those which underlay its prior policy, must include a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id*. at 966 (internal quotation marks omitted). In *Kake*, the court concluded that the Department of Agriculture had not provided a good reason to disregard the factual findings that governed its prior decision. *Id*. at 968. In so holding, the court stated that "[a]n agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Id*. at 969.

Here, the EPA has not made any contradictory determinations. Plaintiffs insist that the EPA's decision to forego rulemaking after previously recognizing its authority to require disclosure of inert ingredients in the ANPR makes this case analogous to *Kake*. But the EPA is not negating its authority to require disclosure in certain situations. The EPA's position is that the hazard determinations on which plaintiffs rely are not akin to an "unreasonable risk" finding under FIFRA and, even if they were, it is not mandated to require label disclosure. Nothing in the ANPR contradicts this position. The ANPR explains that "[t]here is no statutory requirements that the names of all inert ingredients be contained on the ingredients statement." AR0003. "In some cases, however, EPA has determined that in order to meet the requirements of FIFRA certain inert

1  ingredients identities must be disclosed on the labels of products in which they are present." *Id*.
2  This statement is followed up with a review of 40 C.F.R. 156.10(g)(7), which as discussed above,
3  provides that the EPA *may* require disclosure of inert ingredients if the ingredients pose a hazard
4  to man or the environment. *Id*. This is not a declaration that disclosure of the 371 inert
5  ingredients is necessary. Plaintiffs have provided no persuasive evidence that the EPA's decision
6  to forego rulemaking is inconsistent with the ANPR.

## II. THE MAY 2014 DECISION

Considering that plaintiffs have not identified any mandatory duty to act, I now turn to whether the EPA's decision to deny the plaintiffs' rulemaking petition and instead to pursue an alternative path is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. I find that it is not.

A decision is arbitrary and capricious within the meaning of the Administrative Procedure Act when the agency has relied on "factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (citation and quotation marks omitted). A court is not empowered to substitute its judgment for that of an agency. *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001). A court should "overturn an agency's decision not to initiate a rulemaking only for compelling cause, such as plain error of law or a fundamental change in the factual premises previous considered by the agency." *Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 883 F.2d 93, 97 (D.C. Cir. 1989).

The EPA's decision not to pursue rulemaking to mandate label disclosure of inert ingredients is grounded in the statutory text and supported by valid reasoning. As described above, FIFRA grants the EPA discretionary authority to determine how to best manage and address any inert ingredients that may cause unreasonable adverse effects on the environment. No one particular course of action is prescribed. *See* 40 Fed. Reg. 28,252 ("Depending on the risk

involved, the agency is authorized to deny a product's registration, classify the pesticide for restricted use, or require specific label statements."). In its May 2014 letter to petitioners, the EPA announced that it would pursue a "combination of regulatory and focused non-regulatory actions that do not rely on rulemaking" including potentially: (1) removing over ninety chemicals from the list of inert ingredients approved for pesticide use; (2) evaluating the effect of the 371 inert ingredients on food crops; (3) directing pesticide registrants to modify their registrations by replacing hazardous inert ingredients with less hazardous ones; and (4) seeking to expand the existing voluntary disclosure program. AR2877-79.

In support of its decision, the EPA explained that the 405 comments it received in response to the ANPR were "general in nature, either advocating for or against mandatory disclosure of inert ingredients of pesticides, or offering only broad, general reasons articulating their positions." AR2875. The comments also revealed "considerable disagreement among various sectors of the public regarding the appropriateness and even legality of the possible requirements discussed in the [ANPR]." *Id*. Based "in part" on the comments, the EPA decided that pursuing the rulemaking initiated by the ANPR would be "very complex, lengthy and resource intensive." *Id*.

Plaintiffs refute the EPA's characterization of the comments, arguing instead that many of the commenters provided pointed remarks that were directed specifically at the proposals. Even so, the nature of the comments was not the sole reason why the EPA decided to change its course. The letter states that, based on information that the EPA had gathered over the past ten years through surveys and focus groups, the EPA had come to the conclusion that most consumers quickly read only a minimal amount of information on pesticide labels when making a purchase. AR2875. "These findings suggest most consumers will not pay attention to information on product labels disclosing the identity of inert ingredients." *Id*. This led the EPA to question the extent to which a sizeable percentage of pesticide users and purchasers would change their behavior based on disclosure of inert ingredients in pesticides. While plaintiffs may disagree with how impactful disclosure may be, an agency's decision on policy matters is given considerable deference. *See Prof'l Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1221 (D.C. Cir. 1983) ("[R]ulemaking is an inherently policy-oriented process and the agency must be

9

accorded considerable deference in evaluating information presented and reaching decisions based upon its expertise."); *Massachusetts*, 549 U.S. at 533 (acknowledging that the courts have "neither the expertise nor the authority" to evaluate an agency's policy judgments).

It was also appropriate for the EPA to consider its limited resources when determining how best to proceed. *See Massachusetts*, 549 U.S. at 527 ("An agency has broad discretion to choose how to best marshal its limited resources and personnel to carry out its delegated responsibilities."). The letter described the agency's "restricted financial and staff resources" and explained that "[m]erely drafting the required portions of a complex rule consumes significant staff resources." AR 2876-77. Therefore, rulemaking would have been a decidedly long-term project.

Considering these limitations and the reasoning described above, the EPA ultimately decided that a series of non-rule actions would achieve a greater reduction in the risks from the use of pesticides and could be implemented in a timelier manner. AR2877. This decision conceivably offers a less effective remedy than what plaintiffs sought, but it is not arbitrary, capricious, or contrary to the relevant law.

## CONCLUSION

For the reasons described above, the EPA's motion for summary judgment is GRANTED and plaintiffs' motion for summary judgment is DENIED. Judgment shall be entered in accordance with this Order.

**IT IS SO ORDERED**.

Dated: June 29, 2016

WILLIAM H. ORRICK
United States District Judge